**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 6, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

      No. 06-4155

OSCAR ANTONIO LARA-GARCIA,

      Defendant-Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:05-CR-391-TC)

---

Theodore R. Weckel, Salt Lake City, Utah, for Defendant-Appellant.

Karin M. Fojtik, Assistant United States Attorney (Brett L. Tolman, United States Attorney, with her on the brief), for Plaintiff-Appellee.

---

Before **BRISCOE**, **BALDOCK**, and **HARTZ**, Circuit Judges.

**BALDOCK**, Circuit Judge.

The Government has identified Defendant Oscar Lara-Garcia as a previously deported alien. Defendant objects to the means by which the Government discovered his identity. In this case we hold that a federal agent's failure to provide a lawfully detained suspect a *Miranda* warning prior to inquiring about his immigration status does not require suppression of that status where fingerprint evidence subsequently confirms such status.

The material facts as found by the district court and supported by the record are as follows. Officer Cal Miller of the Alpine, Utah police department stopped Defendant Oscar Lara-Garcia's vehicle during daylight hours upon a report of reckless driving. Defendant could not produce a driver's license or any other type of identification. Nor could Defendant remember his social security number. Defendant initially told Officer Miller his name was "Juan Garcia" and his birthday was February 2, 1972. Shortly thereafter, Defendant claimed his name was "Juan Fierro." Defendant reported the vehicle belonged to his brother. When dispatch could not locate a valid driver's license for either "Juan Garcia" or "Juan Fierro," the officer began to prepare Defendant a citation for driving without a license.

While Officer Miller prepared the citation, dispatch informed him that a "Juan Garcia" "had a N.C.I.C. hit out of California" for a parole violation. Dispatch further informed the officer that California wanted to extradite him. The officer testified the parole violator's physical description matched Defendant in certain respects, including weight, height, and eye color. Also, the "Juan Garcia" wanted in California had a birthday of February 2, 1973. Officer Miller estimated he called "back and forth" to dispatch between five and eight times, each time waiting between five and fifteen minutes for a response. Unable to determine after numerous inquiries whether Defendant was in fact the "Juan Garcia" named in the outstanding warrant, the officer handcuffed Defendant and transported him to the Alpine police station. This occurred around ninety minutes into the stop.

Still unable to identify Defendant, Officer Miller placed him, while handcuffed, in a

conference room. Dispatch informed the officer that a federal agent from Immigration and Customs Enforcement (ICE) had phoned and offered to help identify Defendant. ICE agents had been monitoring the communications between the officer and dispatch, and became concerned Defendant might be an illegal immigrant. Officer Miller advised dispatch he would welcome assistance. ICE Agent Timothy Chard arrived at the station soon thereafter. Agent Chard stated he met with Officer Miller who told him "he was waiting for more information from California on an N.C.I.C. hit on the individual for like scars, marks, tattoos, and seeing if they could get a photo or fingerprints to be able to match it up to the individual." Once in the conference room, Agent Chard asked Defendant his name, date of birth, place of birth, and immigration status. The agent did not provide Defendant a *Miranda* warning prior to questioning. Defendant stated his name was "Juan Garcia" and he was an illegal immigrant from Mexico. Following the interview, Agent Chard was in the hallway when Officer Miller returned and informed him that, based on "some scars or tattoos [which] did not match up," Defendant did not appear to be the "Juan Garcia" wanted in California. At that point, Alpine police turned Defendant's custody over to ICE.

Back at ICE headquarters, Agent Chard ran an identity check on Defendant's "right and left index finger" to determine whether Defendant had prior "dealings with immigration." The ICE database recognized Defendant's fingerprints and reported Defendant's name as Oscar Lara-Garcia, a previously deported alien. Defendant was charged with one count of illegal reentry into the United States in violation of 8 U.S.C. § 1326. Following the district court's denial of Defendant's motion to suppress evidence

3

of his identity, Defendant entered a conditional plea of guilty, reserving his right to appeal. See Fed. R. Crim. P. 11(a)(2). The district court sentenced Defendant to 24 months imprisonment. Our jurisdiction arises under 28 U.S.C. § 1291. In reviewing the denial of a motion to suppress, we view the evidence in a light most favorable to the Government. We review the district court's findings of fact for clear error and its determinations of law de novo. See United States v. Gonzales, 399 F.3d 1225, 1228 (10th Cir. 2005).

## II.

Defendant asserted in the district court, as he does on appeal, that Agent Chard "did not have a sufficient basis to detain him to investigate his immigration status and that all evidence obtained as a result of his detention, including evidence of his identity, should be suppressed." United States v. Lara-Garcia, No. 2:05-CR-391-TC, memo. dec. at 8 (D. Utah, March 31, 2006). In a thorough order, the district court first concluded Officer Miller had probable cause to detain Defendant at the police station while the officer attempted to ascertain Defendant's identity and determine whether he was the "Juan Garcia" named in the California warrant. Id. at 8-10. The court further concluded Officer Miller had probable cause to arrest Defendant for failure to possess a valid driver's license. Id. at 10-11. The court next concluded Agent Chard's question concerning Defendant's immigration status constituted a custodial interrogation requiring a *Miranda* warning. Because the agent had not provided Defendant a *Miranda* warning, Defendant's admission that he was an illegal immigrant was suppressible. Id. at 11-14. Nonetheless, under the inevitable discovery exception to the exclusionary rule, evidence of Defendant's identity obtained subsequent to

4

his statement was admissible against him because, according to the court, Agent Chard had probable cause to investigate Defendant's identity apart from the incriminating statement. Id. at 14-19.

## A.

Defendant first argues that at the time of questioning, Agent Chard lacked "reasonable suspicion" to believe Defendant was an illegal immigrant. According to Defendant, ICE unlawfully interjected itself into the investigation to question Defendant about his identity. Defendant faults the district court for failing to "comment directly on whether federal agent Chard had reasonable suspicion to stop and question [Defendant]." Defendant asserts Officer Miller transported him to the police station for no other reason than to hand him over to ICE based on ICE's "hunch" he might be an illegal immigrant. Defendant says "Agent Chard's stop and questioning of [Defendant] should be deemed investigatory, not based upon reasonable suspicion, unparticularized, general in nature and an egregious Fourth Amendment violation."

Defendant's argument is long on rhetoric and short on law. A proper focus requires us first to ask whether Defendant was lawfully detained at the time of Agent Chard's questioning. If so, Defendant was reasonably seized at the time of such questioning in compliance with the Fourth Amendment, and any argument Defendant might make to suppress his identity based on an unlawful detention must fail. Compare United States v. Olivares-Rangel, 458 F.3d 1104 (10th Cir. 2006) (addressing the suppression of identity evidence arising from an unlawful arrest). Importantly, Defendant has not asserted, either

5

in his brief or at oral argument, that Officer Miller lacked probable cause to detain him based on his failure to possess a valid driver's license or inability to identify himself as someone other than the "Juan Garcia" wanted on the outstanding warrant. Rather, Defendant focuses exclusively on law enforcement's purported lack of probable cause to suspect he was an illegal immigrant. Any other reason offered for his detention, Defendant suggests, was merely a pretext for investigating his immigration status.[1]

Unfortunately for Defendant, an officer's "subjective motivation is irrelevant" to the question of whether a particular seizure was reasonable: "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action." Brigham City v. Stuart, 126 S. Ct. 1943, 1948 (2006) (rejecting the argument that the reasonableness of a warrantless entry into a home turns upon the officer's subjective motivation for entering) (internal quotations and

---

[1] Defendant's bald assertion that he was the subject of racial profiling is meritless. A defendant raising such claim

> must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect. To satisfy the discriminatory-effect element, one who claims selective enforcement must make a credible showing that a similarly-situated individual of another race could have been, but was not, stopped or arrested for the offense for which the defendant was stopped or arrested. And the discriminatory-purpose element requires a showing that discriminatory intent was a motivating factor in the decision to enforce the criminal law against the defendant.

United States v. Alcaraz-Arellano, 441 F.3d 1252, 1264 (10th Cir. 2006) (internal citations, brackets, and ellipses omitted). In this case, Defendant has made no showing whatsoever of discriminatory effect or purpose on the part of law enforcement officers.

6

brackets omitted). Aside from the district court's conclusion that probable cause to suspect criminal activity arose from Defendant's likeness to the "Juan Garcia" wanted on an outstanding warrant, the court's holding that Officer Miller had probable cause to arrest Defendant for failure to possess a valid driver's license was quite enough to justify his detention at the police station. We explained in United States v. Santana-Garcia, 264 F.3d 1188, 1192 (10th Cir. 2001), that "[u]nder Utah law, operating a vehicle without a valid driver's license is a Class C misdemeanor. Utah Code Ann. § 53-2-202. Utah law authorizes arrest for the commission of a Class C misdemeanor. Id. § 77-7-2."

In his reply brief, Defendant acknowledges the same by stating Officer Miller "had the authority under Utah law to arrest Mr. Lara-Garcia for a traffic violation outright, without a need to identify who he was." Thus, at the time Agent Chard questioned Defendant about his immigration status, Defendant was detained at the police station based on an objectively reasonable belief he had violated the law.[2] That is all the Fourth Amendment requires to justify Defendant's detention. Agent Chard did not need a second, independent basis to detain Defendant, and did not need probable cause to believe he was an illegal immigrant prior to questioning him.

B.

The more difficult query in this case is whether the Fifth Amendment required Agent

---

[2] In County of Riverside v. McLaughlin, 500 U.S. 44, 55-58 (1991), the Court decided that a suspect held on probable cause generally may be detained up to 48 hours prior to a detached magistrate's probable cause determination. Defendant's detention in this case did not come close to approaching the 48-hour deadline.

Chard to provide Defendant a *Miranda* warning before questioning him about his immigration status. See Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 189 (2004) ("To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled."). That is a question, however, we need not answer.[3] Even *assuming* the district court was correct in holding the agent's question violated Defendant's Fifth Amendment right, the physical evidence which arose from such violation, *i.e.*, Defendant's fingerprints and immigration file, is not suppressible.

In United States v. Patane, 542 U.S. 630 (2004) (plurality), the Supreme Court concluded the exclusionary rule or "fruit of the poisonous tree doctrine" does not apply "to mere failures to give *Miranda* warnings[.]" Id. at 643. Relying on Patane, we subsequently held in United States v. Phillips, 468 F.3d 1264, 1265 (10th Cir. 2006), that physical evidence obtained as a fruit of a defendant's voluntary, *i.e.* uncoerced, statement to a police officer is admissible at trial "regardless of whether the officer gave the defendant *Miranda*

---

[3] Undoubtedly, where a suspect such as Defendant is detained based on probable cause that he may have committed a crime, a law enforcement official may ask the suspect to identify himself without providing a *Miranda* warning. "Questions about a person's identity are not unconstitutional even if identification of the person may help lead to the prosecution of that person for a crime." United States v. Washington, 462 F.3d 1124, 1133 (9th Cir. 2006) (question about a suspect's "gang moniker" did not require a *Miranda* warning). We have previously recognized "the disclosure of name and address is essentially a neutral act and it would be the extravagant extension of the privilege . . . to hold that it is testimonial in the Fifth Amendment sense." United States v. McCurdy, 40 F.3d 1111, 1115 (10th Cir. 1994) (internal quotations and brackets omitted). Furthermore, questions as to date and place of birth are normal questions attendant to arrest and custody and do not require a *Miranda* warning. See United States v. Arellano-Ochoa, 461 F.3d 1142, 1146 (9th Cir. 2006). Thus, Agent Chard's questions as to Defendant's name and birth information did not require a *Miranda* warning.

warnings." In Philllips, police recovered a gun and jacket with blood on it near the scene of a robbery. In response to an officer's inquiry about his limp, defendant stated he had been shot. Defendant did not receive a *Miranda* warning prior to the officer's question. The officer prepared an affidavit for a search warrant based on defendant's response. The warrant sought a swab of defendant's DNA so law enforcement could compare his DNA to that of the blood found on the jacket. A match was made. We held the DNA evidence admissible despite the lack of a *Miranda* warning. Phillips, 468 F.3d at 1265-66. This is because "the *Miranda* rule protects against violations of the Self-Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements[.]" Patane, 542 U.S. at 634.

III.

Accordingly, Defendant's identity and status as an illegal immigrant as revealed by his fingerprints and immigration file is not suppressible. The judgment of the district court is –

AFFIRMED.[4]

---

[4] As to his 24 month sentence, Defendant suggests the district court erred in declining to depart downward from the guideline range based on Agent Chard's alleged *Miranda* violation. Because the district court recognized its authority to grant a downward departure at the sentencing hearing, we lack jurisdiction to review its decision to deny Defendant's motion for such departure. See United States v. Fonseca, 473 F.3d 1109, 1111-1115 (10th Cir. 2007) ("This court may review a denial of a downward departure only if the denial is based on the sentencing court's interpretation of the Guidelines as depriving it of the legal authority to grant the departure."); see also United States v. Washburn, 383 F.3d 638, 644 (7th Cir. 2004) (expressing "serious doubts about whether police misconduct that did not have any effect on the nature of the offense or the individual offender would ever be a permissible ground for departure").